IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                        Case No. 16-10075-01-JTM

RANDOM SHANE SMITH,

    Defendant.

MEMORANDUM AND ORDER

In October of 2015, S.P. and F.P., twin sisters who were then sixteen or seventeen years old, told their mother that her boyfriend, the defendant Random Shane Smith, had been sexually abusing them for some six years. The twins were born in 1998. The mother, a United States Army Sergeant stationed at McConnell Air Force Base in Wichita, Kansas, did not initially believe the information because she believed Smith was impotent and unable to have intercourse. Still, she drove her daughters to Mendota, Illinois to live with her parents. The mother did not report the alleged abuse to law enforcement.

While the girls were in Mendota, according to information latter supplied to investigators, they received threatening or abusive emails from Smith, including an email from Smith that "I fucking hate you more than anything just fucking die."

The girls reported the abuse to their grandparents, who then informed the local police. The police informed armed forces investigators, and two AFOSI Agents, Pingaree and Inness interviewed the girls.[1]

Summarizing the interview conducted by Pingaree and Inness, a Special Agent of the FBI prepared an affidavit which was submitted to United States Magistrate Judge Gwynne Birzer. The affidavit sought permission to search the mother's residence at McConnell to investigate likely violations of 18 U.S.C. § 2241(a), 18 U.S.C. § 2251 (production of child pornography), and 18 U.S.C. § 1512(b)(3) and (d) (witness tampering). Based on this affidavit, Judge Birzer authorized a search of the base housing used by the mother and the defendant. The defendant has been charged with two counts of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(a) (Counts 1 and 2, respectively, directed as to each of the two sisters); separate counts of production and possession of child pornography, in violation of 18 U.S.C. § 2251(a) (Count 3 and 4), and one count of tampering with a witness or victim, in violation of 18 U.S.C. § 1512(b)(3) (Count 5).

The matter is now before the court on two motions by Smith. First, Smith seeks to suppress the results of the warrant. (Dkt. 39). Second, he has moved for a bill of particulars. (Dkt. 36). For the reasons provided herein, the court denies defendant's motions.

Much of the affidavit in support of the warrant contains background material as to the investigation and the affiant's knowledge of the prior cases of abuse. The core of the

---

[1] The interview with F.P. was apparently not recorded. Accordingly, the defendant's present motion turns entirely on the alleged dissonance between the affidavit later used in support of the warrant and the interview with S.P.

affidavit, discussing the sexual abuse of S.P. and F.P., is contained in two paragraphs.

Paragraph 18 provides:

> Both MV1 (S.P.) and MV2 (F.P.) confirmed and provided additional details regarding SUBJECT's [Smith's] sexual abuse of the minor victims, including (but not limited to):
>
> a. Both girls were afraid of SUBJECT, because of his strength, physical size and military training. A few times SUBJECT pushed MV1 to the ground if she refused to comply with SUBJECT's demands for MV1 to perform sexual acts on him.
>
> b. For MV1, the sexual abuse began in Maryland in 2009, where SUBJECT would kiss and lick MV1. The sexual abuse continued when MV1 moved to North Carolina, where SUBJECT forced MV1 to perform sex acts on him. In North Carolina, SUBJECT began subjecting MV1 to penetrative sexual acts.
>
> c. When MV1 moved to [McConnell] in April of 2014, SUBJECT continued to force MV1 to perform sex acts upon, or with, SUBJECT. A few times SUBJECT forced MV1 and MV2 to perform sex acts on him at the same time. Further, SUBJECT used bath robe belt to bind MV1's arms to the bed and use[d] a sleeping mask to blind her face and perform penetrative sexual acts on her. SUBJECT also forced sexual acts to be performed by MV1 in the kitchen on a counter across from the refrigerator at [address redacted], in a dark brown recliner in the living room at [redacted], in the basement at [redacted] on a variety of blankets, on a bed in the bedroom of MV1's mother at [redacted], on Ninja Turtle sheets in MV1's bedroom at [redacted], and on the bed in the spare bedroom at [redacted].
>
> d. MV2 reported hearing SUBJECT trying to persuade MV1 to perform oral sex on him in Maryland, but did not confront SUBJECT.
>
> e. For MV2, the sexual abuse began later, in North Carolina, where SUBJECT would use his fingers to touch MV2's genitals while she slept.
>
> f. When MV2 moved to MCAFB in April of 2014, SUBJECT continued to sexually abuse MV2, forcing her to perform oral sex while holding and moving her head and subjecting MV2 to penetrative sexual acts. For

> MV2, SUBJECT would force MV2 to engage in sexual acts in a dark brown recliner in the living room at [redacted], on a bed in the bedroom of MV2's mother at [redacted], and on Disney Minion sheets in MV2's bedroom at [redacted].
>
> g.  The sex acts perpetrated by SUBJECT while in Kansas occurred on-base at [redacted], Wichita, Kansas 67210.

Paragraph 19 is much shorter. It states that S.P. told Pingaree and Inness:

> that [Smith] took nude pictures of her genitals, as well as pictures while he engaged in sexual acts with her. She reported he used his cell phone to do this, and that the pictures were taken at [address redacted], Wichita, Kansas, 67210.

In his motion to suppress, Smith alleges that the affidavit was actively misleading because it failed to identify the following facts revealed in S.P's interview:

(1)  Smith's photographing S.P during sex was a one-time event, occurring some two years before the affidavit for warrant (Dkt. 39, at 10-11);

(2)  the sexual activity occurred without actual force (*Id*. at 12-13).

(3)  Smith deleted the photos shortly after taking them;

(4)  To the extent Smith had other sexual photos on his phone, these were all photos of adult women; and

(5)  In addition to disbelieving the girls' report because she believed Smith impotent, their mother also doubted their story because the girls recanted their story shortly afterwards.

Smith argues the affidavit contained both material misstatements and material omissions. He argues that the affidavit was actively misleading in suggesting the photography was ongoing, when in reality S.P.'s statement indicates that he took five to eight photographs of her vagina or during sex, and that this occurred while they were

4

living in temporary base housing, which would have occurred in February of 2014. In addition, he contends that the allegation of physical force of pushing in Paragraph 18 was actively misleading because S.P. never states in the interview that Smith pushed her during or prior to sexual intercourse.

Smith argues that the affidavit was deliberately misleading in order obscure the staleness of the information about the sexual photography, and to supply the force element of the federal crime he is charged with. He contends that the affidavit's allegation of the use of force was deliberately misleading so as to obscure the fact that S.P. had reported that "she had turned down Mr. Smith for sex and that the relationship was a boyfriend dynamic." (Dkt. 39, at 13).

Smith argues that the warrant should be suppressed because it is a general warrant which fails to describe with particularity the target of the search, citing decisions such as *United States v. Riccardi*, 405 F.3d 852, 861-63 (10th Cir. 2005). (Dkt. 39, at 14-17), and that the warrant lacked probable cause. (*Id*. at 17-23). Moreover, he contends, since the exclusion of the relevant information was intentional or reckless the court must conduct a separate hearing to determine the affidavit's truthfulness under *Franks v. Delaware, 438* U.S. 154 (1978).

The government responds by distinguishing cases cited by the defendant, such as *United States v. Edwards*, 813 F.3d 953 (10th Cir. 2015), finding there was no probable cause to support a search for possession of child pornography, based solely on a general and lawful collection of child erotica. The government argues that *Edwards* is inapplicable

because the warrant here did not rest on generalized interest in child erotica. More significantly, however, the government stresses that *Edwards* is simply inapplicable because the sexual photography here was part of the continuous and repeated sexual abuse of S.P. Thus, the case "involves the blending of sexual abuse with production of child pornography." (Dkt. 45, at 10). And the photography was not stale, it argues, because the timeliness element of probable cause is not necessarily a mathematical calculation, but rests on a consideration of the entire case, including "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

In his Reply, the defendant relies (Dkt. 46, at 9) on cases such as *United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008), which concluded that a warrant seeking evidence of child pornography was not supported by an affidavit documenting child molestation, "an entirely different crime." *Hodson* is distinguishable. In that case, the court stressed that "the affidavit does not establish, allege, or even suggest any basis for a finding of probable cause to believe that Hodson had ever been involved in child pornography in any manner." *Id.* The affidavit in the present case, in contrast, documented the defendant's use of his phone in photographing S.P.'s vagina and acts of sexual intercourse between the defendant and S.P.

Conversely, the defendant's attempt to distinguish *United States v. Colbert*, 605 F.3d 573 (8th Cir. 2010), cited by the government, is unconvincing. *Colbert* found *Hodson* factually distinguishable, but also rejected a central assumption of that case, that

> evidence of a defendant's tendency to sexually abuse or exploit children is irrelevant to the probable cause analysis ... based ... on a categorical distinction between possession of child pornography and other types of sexual exploitation of children.

6

> [T]hat distinction seems to be in tension both with common experience and a fluid, non-technical conception of probable cause. *See* [*Illinois v*.] *Gates*, 462 U.S. [213,] 230–32, 103 S.Ct. 2317 [(1983)]. Evidence adduced to support probable cause must be "weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 232, 103 S.Ct. 2317 (internal quotation omitted). The probable cause analysis is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.*
>
> There is an intuitive relationship between acts such as child molestation or enticement and possession of child pornography. Child pornography is in many cases simply an electronic record of child molestation. Computers and internet connections have been characterized elsewhere as tools of the trade for those who sexually prey on children. *See, e.g., United States v. Paton*, 535 F.3d 829, 836 (8th Cir.2008).

The defendant suggests that *Colbert* is distinguishable by stressing (Dkt. 46, at 9 n. 8) that Colbert's apartment was searched "after he spen[t] 40 minutes attempting to lure a five year old girl to his home." The *Colbert* court noted that during this time the defendant told the girl he had "some movies for her to watch." *See Colbert*, 605 F.3d at 578 (observing that under the circumstances "it would strain credulity to believe that Colbert was attempting to lure the child there to watch, say, 'Mary Poppins' or 'The Sound of Music'").

Here, unlike *Colbert* and *Hodson* or any other case cited by the defendant, the affidavit supplied direct evidence of *both* sexual molestation *and* the production of child pornography. *Colbert* dealt with the inferential value of forty minutes of attempted enticement. The affidavit in the present case documented *years* of ongoing sexual abuse of two minor sisters by the defendant, coupled with the actual production of child pornography in at least one instance. The affidavit further documented that throughout this time Smith used electronic devices to monitor and control his victims, and to subsequently attempt to intimidate them after they were removed from the house.

The burden is on the defendant to show by a preponderance of the evidence that the affidavit intentionally or reckless contained materially misleading information. *United*

7

*States v. Perkins*, 850 F.3d 1109, 1116 (10th Cir. 2017). The court must conduct a *Franks* hearing if the defendant meets this burden "and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).

The court finds the defendant has not met this burden. As noted earlier, with respect to the production of child pornography, the defendant argues the affidavit was deliberately misleading in obscuring the fact that there was a single incident. Smith's argument focuses on S.P.'s answer to a question towards the conclusion of the interview. The investigators asked S.P if Smith had taken sexual photos of her or her sister. S.P. responded that she did not know about F.P.,

> but I know he took pictures of my, uhm, vagina. And whenever we first moved to Kansas, we were in the, uhm, kind of temporary housing, and we had a mirror on his bed, on the wall, behind his bed, and he would, uhm, take pictures of us in the mirror from behind. He had, uhm, taken pictures of — while I was riding him from — from behind. And that's all the pictures he took.

(Dkt. 39-1, at 39).

As noted earlier, Paragraph 19 of the affidavit alleges:

During the interview by AFOSI, MV1 also disclosed that SUBJECT took nude pictures of her genitals, as well as pictures while he engaged in sexual acts with her. She reported he used his cell phone to do this....

It is not clear that it was only one incident of photography. The government correctly notes that the text appears to suggest at least two incidents. separately photographing S.P.'s vagina and photographing an act of sexual intercourse. The court

notes the affidavit does not directly allege the continuous or repeated production of sexually explicit photos. Paragraph 19 thus stands in contrast to the rest of the affidavit, which states that the sexual acts between Smith and S.P. occurred "repeatedly" (Aff. at ¶¶ 10, 15), Rather, Paragraph 19 is similar to S.P.'s response, which could be taken to mean that the photograph occurred at one time, or could suggest on-going activity ("he would ... take pictures" vs. "SUBJECT took ... pictures while he engaged in sexual acts").

The court does find troublesome the failure of the affidavit to include S.P's additional comment that "that's all the pictures he took." (Dkt. 39, at 39). The affidavit also failed to include a reference to S.P.'s belief that it was unlikely the photographs were still on Smith's phone. S.P. told investigators: "But I do not believe he -- I knew he took them but I do not believe he kept them because he was on the same plan with my mother and she could have access to his phone at any time." (*Id.*)

However, S.P.'s statement also makes clear that she had no personal knowledge the photos were deleted. She merely supposed they had been, because her mother might access defendant's phone.

But the rest of the evidence shows this unlikely. The victims' mother turned a blind eye or was credulous, and not likely to suddenly demand an inspection of the phone. Indeed, the interview otherwise strongly suggested that Smith was confident the girls' mother would not initiate any search in an attempt to rebut her belief that he was impotent. For example, S.P. told investigators that Smith

> had a TV stand that had a pull-out drawer and that's where he kept his

9

> pump, lube, vibrators, condoms if he had any. He would keep it down there because my mother never looked there.

(*Id*. at 10).

Moreover, S.P. otherwise indicated that Smith used electronic devices as an integral part of the abuse. After reporting that Smith had required the girls to have sex together, investigators asked "where he came up with all the ideas," and S.P. responded that Smith "had ... the Kama Sutra on his phone." (Dkt. 39-1, at 38). She also told investigators that she repeatedly saw him use his phone to view sexually explicit or suggestive photos on his phone throughout this period –

> whenever I would be sitting in the living room, he would be on his phone and he would either be on Google looking at some pictures or he had a bunch of pages on Facebook that had a bunch of, like, that kind of stuff; but, I never, like, confronted him about it because it was kind of like I was sitting in the chair, he was sitting in his, and I just looked over and it was there.

(*Id*.) Although S.P. later stated that she did not think the women pictured were "not younger than 18" (*id*. at 40), the repeated viewing of explicit images, and his use of his phone as a source of ideas, indicates that use of electronic devices was a part of a long-term, sexually abusive relationship, and that it was likely that he had in fact retained as trophies his earlier photographs of S.P.

Because the court must determine whether any omissions or misstatement were intentional or reckless or deliberate, and whether the affidavit (when corrected for such errors) lacks probable cause, the court must undertake a careful comparison of the affidavit and the underlying statement by S.P.

The interview fully and amply supports the conclusion that the relationship with both sisters was abusive, nonconsensual, and continuous. Defendant correctly notes that the affidavit errs in stating that Smith "pushed" S.P. down as a preliminary to sexual intercourse. But interview otherwise fully documents the nonconsenual nature of the relationship, and that this lack of consent derived in part from the actual and threatened use of physical force. And, if anything in the present case is misleading, it is defendant's claim that the relationship he had with S.P. was a "boyfriend dynamic."

Smith, according to S.P. in her interview (Dkt. 39-1), began to abuse her when she was twelve years old. Prior to moving to Kansas, the abuse occurred "anywhere in the house, his room, my room, the living room whenever my mother's not home." (*Id*. at 8). S.P. repeated this that the abuse occurred "[e]very day, constantly." (*Id*. at 7). What changed after moving to Kansas, she reported, was that Smith "started ... having me and F.P. do stuff together." (*Id*.) This occurred because Smith "wanted, you know, to be with me all the time," and needed to involve F.P. in the abuse to further this end. (*Id*. at 15).

> In Maryland, it wasn't that often. It was just kind of a once, maybe, a week thing. When we got, like, to North Carolina and Kansas -- in North Carolina it was like maybe three times a week. Kansas, it was every day.

(*Id*. at 9).

While S.P. was occasionally able to avoid a particular type of sexual contact, the relationship was coercive and non-consensual. Far from being an actual "boyfriend dynamic," S.P. made clear that any such dynamic was false and indeed a part of Smith's manipulative and controlling behavior:

11

> He basically thought he was a boyfriend to me. That's what he acted like. He acted like a boyfriend and a lover and, you know, he had told me stuff, like, after I graduated and he was done with his schooling, we were gonna run away together. We were gonna go live wherever and it was going to be me and him. I never wanted that.

*Id.* at 11. S.P. did not want to tell Smith that because he "intimidates me.... He's a very strong, buff man. He's, like, really tall and he's got a lot of strength on him." (*Id.* at 12). If she had told him the truth, she responded:

> He would have got really mad. Uhm, there were times, like, because he thought he was my boyfriend, that I had to hide my actual boyfriends and if he found out, he became angry and violent with me. He's not done any serious harm but he's, like, pushed me and stuff like that.

(*Id.*) S.P. made clear that the "pushing" was both physical and emotional. She reported that Smith wanted her to engage in anal intercourse, but

> I didn't wanna do it. And then he just kept pushing me and pushing me and pushing me for it and so I was like, you know what, fine. I basically gave in. And, uhm, he would push me for it.

(*Id.*)

When Smith began abusing F.P. after the family moved to Kansas, S.P. stated her sister was

> the same way I was. He's intimidating to us both. And every night after it happened, or whenever it happened, she would basically just tell me how bad she wanted to stop; but didn't have the nerve to say anything.

(*Id.* at 16). S.P. stated that F.P., when Smith initiated his plan to include F.P. in the sexual activity, "[s]he didn't wanna do it. And there would be times when she did tell him no, but, you just don't love me, stuff like that, guilt-tripping her basically into doing what he

12

wanted when he wanted it." (*Id.* at 35).

Far from being an actual boyfriend relationship, F.P. and S.P. were forced to hide their actual boyfriends from Smith, because he would become angry. She explained that Smith might retaliate physically, explaining that while "I do not believe he ever got violent with [F.P.,] he did with me." (*Id.*) Moreover, Smith used electronic devices as a part of his violence and control over her. When she tried to have an independent social life, Smith:

> always found out through Facebook. I would hide Facebook. I have hidden my mom, anybody, family, who can find me, blocked. He made alternate Facebooks. Tried to find me. I made memes, he still found me. And whenever he did it, you know, uhm, he would typically do it while I'm at school. I had a laptop from the school, so I'd be on my e-mail with him quite frequently. And he would, you know, tell me, uhm, hey, I found something out, we need to talk when you get home.

(*Id.*)

The use of electronic devices was an integral part of the relationship:

> I'd get home. We immediately go in our room and put our stuff down and FP would typically stay in there and get on the laptop, whatever, and I would go out and greet him. And, uhm, you know, he would have the computer screen black. You could turn the screen off without the actual computer being off. And then he would have it up, oh, yeah, why don't you go to the computer and turn on the screen. Okay. I'd turn on the screen and it would be right there. And then starts yelling, like, what the fuck is this, why would you do this to me, you don't really love me if you're gonna hide all of this and be with someone else. And, of course, you know, like, I'm sorry, I just needed someone I could be -- and that's what it was to me -- I needed someone who I could be open with, someone who the public could see that I was with.
>
> ....
>
> [A]nd then after he found out he had` me log on to my Facebook, scroll through everything, find something he doesn't like, yell at me, kick stuff,

throw stuff, not at me, but around me. And eventually, if he got really mad, he would push me. He didn't do anything ever to actually, like, leave marks or anything; but, enough to where I got the warning.

Asked about this pushing, S.P. stated that "[i]t wasn't too hard; but, he would, uhm, shove me hard enough to where I would still go backwards and fell." The force was "[n]ot too hard to leave marks but enough to give me the warning that you do this again and it's gonna be more serious." (*Id*.).

She stated that the relationship began when "I was roughly 12 or 13" and "didn't know what was going on." (*Id*. at 19). Afterwards, "I knew it was wrong, but I was too scared to stop." (*Id*.) S.P. stated that Smith and she had vaginal intercourse 90 to 100 times in North Carolina. (*Id*. at 31). Asked about the frequency of sexual activity after the family moved to Kansas, S.P. responded, "Every day." (*Id*. at 37). In additional to sexual intercourse, Smith also engaged in oral, anal, and digital intercourse with S.P., and used artificial sexual objects on her. He would also blindfold and tie S.P. to the bed before engaging in sex. (*Id*. at 32).

After she reported the abuse and moved to Illinois, S.P. reported "that's when he started threatening me and her, saying that we were both whores, liars, and we both needed to go kill ourselves, or die." (*Id*. at 14).

First, the court finds that defendant has failed to demonstrate that misstatements and omissions which allegedly exist in the affidavit were likely to be the product of intentional or reckless conduct by the affiant. He alleges that the allegation of physical pushing in connection with sexual intercourse was intentionally deceptive in order to

allege the element of physical force necessary for a violation of 18 U.S.C. § 2241. But while the statue does require the use of force, it does not require direct physical force at the same time as sexual contact. Rather, it may arise if a defendant "employs restraint sufficient to prevent the victim from escaping the sexual conduct," and the necessary level of force may be "implied from a disparity in size and coercive power between the defendant and his victim, as for example when the defendant is an adult male and the victim is a child." *United States v. Lucas*, 157 F.3d 998, 1002 (5th Cir.1998) (citations omitted). Given this standard, and the clear statements by S.P. that she was intimidated by Smith in part because of her age and the disparity in their physical size, there was no need for embellishment by the affiant.

Similarly, the affidavit does generally indicate that the mother disbelieved the statements of her daughters because she believed he was impotent. Paragraph 19 of the affidavit states that Smith photographed S.P. "while he engaged in sexual acts," which roughly parallels S.P's comment Smith "would ... take pictures of us." As noted earlier, the remainder of the affidavit, addressing the sexual contact in general, indicates that it occurred "repeatedly." Paragraph 19 is devoid of any indication as to the frequency of the photography.

While the affidavit does not explicitly include S.P.'s statement of belief that Smith might have deleted the explicit photos, the exclusion was not likely to be intentional or reckless, given that the belief was explicitly speculation. Moreover, the speculation — that the photos would have been deleted because her mother could have accessed Smith's

15

phone — was unfounded given the other affirmative statements by S.P. which established that her mother "basically ignored everything" which would indicate the existence of an abusive relationship (Dkt. 39-1, at 19). Thus, Smith engaged in abusive sexual relations with the girls in the front room while their mother was sleeping in the bedroom. (*Id*. at 25). Similarly, S.P. described how Smith kept a variety of sexual devices in the home, without fear of discovery, and indeed kept additional sexual materials on his phone, such as the Kama Sutra and photographs of other women, for apparently an extended period of time.

Second, even if omissions or misstatements were excluded by design, the court finds that Smith has failed to show that, once the affidavit is corrected by reference to S.P.'s underlying statement, the document fails to supply probable cause. To the contrary, the court finds that the affidavit, read in light of and corrected by additional material from S.P.'s statement, provides probable cause for the issuance of a warrant.

The modified affidavit indicates that Smith engaged in continuous sexual abuse of S.P. from the time she was approximately twelve years old. The abuse was virtually constant, and included as an integral element physical force and intimidation. After the family moved to Kansas, the abuse included S.P's twin sister. Throughout this time, Smith used electronic devices, particularly his phone, as an integral part of the abusive relationship. He used these devices to monitor the online behavior of S.P and F.P., essentially cyberstalking them in order to preclude any outside social life. He used these devices as a means of giving him ideas for additional types of abuse. And, once the abuse was revealed and the girls moved to Illinois, he used these devices to call and email the

16

girls in an attempt to intimidate them.

Smith argues that the 2016 emails cannot be a true "threat" as they contain "no commands or demands." (Dkt. 39, at 19). But the witness tampering statute, 18 U.S.C. § 1512, is not restricted to direct threats of physical violence combined with an explicit command to do any particular action. § 1512(b)(3) prohibits any acts which are either threats or amount to "intimidation" of a witness. § 1512(d) prohibits an act which "harasses" another person so as to delay or dissuade a person from reporting to the police.

Here, Smith emailed the girls that he hoped they would "fucking die." S.P. explicitly told the investigators that she perceived Smith's comment as a threat. Smith made the comment after learning that the girls had reported the sexual abuse, and the comments should be viewed in light of the long-standing, nonconsensual heinous sexual abuse of the two sisters. A reviewing magistrate could properly determine on the basis of this evidence that investigators would likely find evidence of witness tampering on defendant's phone or other electronic devices.

The court finds that a neutral magistrate, reviewing the affidavit corrected in light of the underlying statement, would conclude both the Smith's phone and other electronic devices would likely contain evidence of witness tampering and of child pornography. Given the evidence, it was likely that Smith's devices contained evidence supporting S.P.'s story as to the type and duration of the intimidation and coercion involved. The affidavit otherwise documents the tendency of persons with a sexual interest in children to "collect sexually explicit materials." (Dkt. 39-2, at 7). These individuals also tend to "maintain their

child pornographic material" after obtaining it. (*Id*. at 8).

According to S.P., throughout the long-standing abuse, Smith used electronic devices, including his phone and associated applications such as Google and Facebook, to assist in his controlling and manipulative behavior. Smith took sexually explicit photos of S.P. while she was a minor. S.P.'s speculative hope that the photos might have been deleted to hide them from her mother was entirely unfounded, given the other evidence in the case. Given the evidence as to Smith's conduct, and the other evidence relating to the tendency of similar persons to collect and maintain such material, it is reasonable to conclude that Smith's phone also retained evidence of his explicit photography of S.P.

The warrant issued by Judge Birzer was not an impermissible general warrant. The warrant is not directed at all computer or electronic files found on the premises generally, but carefully targets information relating to specific federal crimes — here, sexual assault, child pornography and witness tampering. The warrant sought the seizure of particular items of evidence documenting these crimes, identifying them with sufficient particularity to electronic items to be seized. (Dkt. 39-2, Attachment B).

Finally, the court denies the defendant's request for a bill of particulars. Such relief is generally denied if the indictment sets forth the elements of the offense and gives the defendant gives the defendant a sufficient basis to prepare for trial. *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996). The burden is on the defendant to demonstrate that, in the absence of a bill of particulars, he or she will not have any meaningful opportunity to prepare a defense, risks unfair surprise at trial, or faces a serious risk of double jeopardy.

*See United States v. Diaz*, 2011 WL 6118610, *2 (D. Kan. Dec. 8, 2011). Whether to grant a bill of particulars under Rule 7(f) is committed to the discretion of the court. *Will v. United States*, 389 U.S. 90, 99 (1967). "A defendant is not entitled to know all the *evidence* the government intends to produce, but only the *theory* of the government's case." *United States v. Levine*, 983 F.2d 165, 167 (10th Cir. 1992) (internal quotations omitted, emphasis added in *Levine*).

Through the allowance of free discovery and access to the available evidence, the defendant is not in danger of unfair surprise. The detailed statement by F.P. has long been available to the defendant, and the defendant has sought and obtained additional time to prepare for trial in order to receive DNA evidence. (Dkt. 30, 35). The indictment identifies the conduct in issue as to each count, and each count identifies and relates to conduct directed at different victims and does not raise any meaningful risk of double jeopardy. The defendant has failed to show more particularity is needed to frame a defense.

IT IS ACCORDINGLY ORDERED this 18th day of September, 2017, that the defendant's Motions to Suppress and for Bill of Particulars (Dkt. 38, 36) are hereby denied.

                                                              s/ J. Thomas Marten
                                                       J. THOMAS MARTEN, JUDGE